[600 NYS2d 867]

EUGENE V. PORTER et al., Respondents, v LSB INDUSTRIES, INC., Appellant.

Fourth Department, July 16, 1993

### APPEARANCES OF COUNSEL

*Damon & Morey,* Buffalo *(Deborah Norton* of counsel), for appellant.

*Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria,* Buffalo *(John Collins* of counsel), for respondents.

### OPINION OF THE COURT

DENMAN, P. J.

Plaintiffs brought this action sounding in strict products liability and negligence to recover for injuries sustained by plaintiff husband while operating a "Rockland" lathe at his place of employment. Plaintiffs originally sued LSB Industries, Inc. (LSB) on the theory that LSB, the registered owner of the "Rockland" trademark, had manufactured, sold, or distributed the lathe or otherwise placed it in the stream of commerce. As revealed by the record, however, the lathe actually had been sold by LSB's wholly owned subsidiary, Summit Machine Tool Manufacturing Corp. (Summit), which is not a party to this appeal.

On LSB's appeal from denial of its motion for summary judgment, the following issues are presented: whether LSB is subject to long-arm jurisdiction based on its own contacts with New York; whether LSB is subject to jurisdiction based on Summit's contacts with New York; whether LSB can be found liable for its own conduct; and whether LSB can be found liable for Summit's conduct. Because we answer all of those questions in the negative, we reverse and grant summary judgment dismissing the complaint against LSB for lack of jurisdiction and failure of proof of liability.

### BACKGROUND

Plaintiff Eugene V. Porter was injured on January 7, 1987 while employed by Buffalo Pumps, Inc. (Buffalo Pumps). Porter was removing a chuck from the lathe he was operating when the drive activated, causing his injury. The lathe bore the trademark "Rockland", which is registered to LSB. Plain-

tiffs commenced a products liability and negligence action against LSB, asserting jurisdiction under CPLR 302, the long-arm statute. The complaint alleges that the lathe was defectively designed, manufactured, assembled or placed on the market by LSB or its agents. In its answer, LSB generally denied liability, denied that it was subject to long-arm jurisdiction, and raised a defense of lack of personal jurisdiction.

Following disclosure, LSB moved for summary judgment dismissing plaintiffs' complaint on the grounds of lack of personal jurisdiction and lack of liability for the alleged torts of its subsidiary, Summit. Plaintiffs opposed the motion. The motion papers reveal the following facts relevant to the issues of jurisdiction and liability: LSB was originally incorporated in Oklahoma in 1968 and reincorporated in Delaware in 1977 as a successor corporation to the original. Headquartered in Oklahoma City, LSB is a diversified holding company that conducts all of its business through wholly owned subsidiaries, of which there are at least 20, and all of which were ongoing businesses when acquired by LSB for investment purposes. Generally, the subsidiaries are in the business of manufacturing and selling chemical products, heating and air conditioning equipment, bearings, oil field equipment, and industrial products, including machine tools. LSB has never designed, manufactured, distributed or sold any goods. In contrast to its subsidiaries' stock, LSB's stock is publicly traded, and is held by several thousand shareholders. During the most recent reporting periods covered by the record, LSB continued to diversify its holdings by acquiring new subsidiaries, resulting in the parent's "sales" growing from approximately $75,000,000 in 1984 to approximately $212,000,000 in 1988.

LSB has no direct contacts with New York. It has never maintained offices, solicited business, maintained bank accounts or other properties, or maintained employees in New York, nor has it derived revenue directly from the sale of goods or services in New York. None of LSB's subsidiaries engages in activities in New York for the benefit of LSB, under its direction or control, or with its permission.

Summit is 100% owned by LSB. LSB did not underwrite Summit's incorporation; rather, Summit was an independent corporation and ongoing business when purchased by LSB in 1968. Summit's business consists of the distribution of machine tools, some of which, like the lathe in question, are

marketed under the trade name Rockland. Although that trademark has been registered to LSB since 1969, it has never been used by LSB. None of LSB's other subsidiaries markets products under the Rockland trademark. Apparently, Summit does so by way of an informal arrangement with LSB rather than any formal licensing agreement. Summit sells its Rockland tools through independent distributors who market throughout the United States. One such distributor, Slagla, is located in Rochester, New York, and possibly distributes Summit's products in New York. Another is New England Machine Tool Corp. (New England), an unrelated entity located in Lynn, Massachusetts, which distributes Summit's products throughout the northeast. Summit does not maintain offices, employees, bank accounts or other properties in New York. Given its limited business contacts with New York distributors, Summit derives less than 1% of its revenues from sales of goods or services in New York.

The Rockland lathe in question was manufactured in Yugoslavia by a company known as Potisje Ada, for which Summit was the exclusive distributor in the United States. The lathe was shipped to Summit in the United States in 1971. Upon receiving a shipment from the European manufacturer, Summit typically would uncrate and clean the lathes, check them for damage, check their operation, and affix the Rockland nameplates before reselling them. Summit sold the lathe to New England in March 1972. New England then sold the lathe to plaintiff's employer, Buffalo Pumps. Typically, New England would place an order with Summit either for its own inventory or for direct shipment to a customer pursuant to a specific order. Summit sometimes stocked machines for New England and in that case would ship directly to New England's customer, but did not directly ship the lathe to Buffalo Pumps in this instance. Summit sometimes performed installation and maintenance work on the ultimate customer's premises, but again did not do so in this instance. Apparently Buffalo Pumps made payment directly to New England and New England paid Summit. Not only was Summit not involved in the ultimate sale, it did not enter the State for the installation, inspection, repair or maintenance of the lathe, never contacted representatives of Buffalo Pumps, and never contracted with any party to supply inspection, maintenance or repair services in New York. LSB had no knowledge of New England's subsequent sale of the lathe to Buffalo Pumps and received no benefit.

With respect to the relationship between LSB and Summit, the record establishes that Summit, like LSB, is headquartered in Oklahoma City. Prior to 1974, Summit's principal offices and warehouse were located at the same address as LSB's offices, but in a separate facility. Since 1974, Summit's offices have been located over a mile from LSB's, in a building owned by another of LSB's subsidiaries. No other subsidiaries of LSB do business at Summit's facility. The current president of Summit is Steven Golsen, the son of Jack Golsen, who is LSB's chairman and president and former president of Summit. Summit's president and vice-president are not and never have been officers or directors of LSB. LSB has 13 officers and directors; Summit has six officers and two directors. Four of those who are officers or directors of LSB are also officers or directors of Summit. The two entities do not have common shareholders.

LSB does not remove or appoint Summit's officers or directors. The officers and directors of Summit act independently and do not take their orders from LSB. LSB does not interfere in the hiring or assignment of any of Summit's 60 to 70 employees, nor does LSB control the marketing or operational policies of Summit. LSB does not decide what products Summit will distribute or how resources will be allocated to various products. Additionally, Summit maintains its own business contacts, generates its own product brochures and literature, and does its own advertising.

Concerning the financial relationship between the two entities, the record establishes that, although Summit submits its annual budget to LSB for approval, Summit maintains its own assets. LSB does not finance Summit's day-to-day operations, and does not pay the salaries of Summit's personnel or its other expenses or losses. In LSB's financial statements, Summit is not referred to as a division or department. Although LSB provides certain accounting, legal and banking services for Summit, Summit pays LSB at competitive market rates for all such services. LSB has loaned money to Summit, albeit with interest. LSB has never guaranteed a loan to Summit.

### LSB IS NOT SUBJECT TO JURISDICTION BASED ON ITS OWN CONDUCT AND FORUM CONTACTS

Plaintiffs' arguments concerning personal jurisdiction over LSB and LSB's substantive liability are based on the fact that LSB is the registered owner of the "Rockland" trademark.

Plaintiffs assert that, under New York and Federal law, by registering the Rockland trademark, LSB identified and represented itself as the sole "user" of the trademark. Plaintiffs thus argue that LSB is estopped from denying that it put the lathe and other Rockland products into the stream of commerce, or that it appointed Summit as its agent for that purpose. Similarly, with respect to the issue of jurisdiction, plaintiffs argue, based on the trademark registration, that LSB either committed a tortious act outside the State while maintaining the requisite New York contacts, or that it is responsible for Summit's commission of a tortious act outside the State while Summit maintained contacts with New York (see, CPLR 302 [a] [3] [i], [ii]).

■ Plaintiffs' contentions misconstrue the purpose of the trademark law, which is to protect the owner of a trademark from unfair competition. It is not an adjunct to the law of negligence or products liability, which depends on proof that defendant actually designed, manufactured, sold, distributed, or marketed the allegedly defective item (see generally, Sukljian v Ross & Son Co., 69 NY2d 89, 94-95). Ownership and registration of a trademark may indicate nothing more than the fact that the registrant had a marketing idea or concept. It is common for a registrant not to use a trademark itself, but to license it for use by another entity. Products liability cannot be imposed on a party that is outside the manufacturing, selling or distribution chain (Zwirn v Bic Corp., 181 AD2d 574, 575; Delzotti v American LaFrance, 179 AD2d 497, 498; Kane v Cohen Distribs. of Gen. Mdse., 172 AD2d 720; Watford v Jack LaLanne Long Is., 151 AD2d 742; Smith v City of New York, 133 AD2d 818, 819), and there is no reason to create an exception for licensors of trademarks. If trademark registration alone were a sufficient predicate for strict products liability, a licensor would always be liable (contra, Kane v Cohen Distribs. of Gen. Mdse., supra, at 721; Balsam v Delma Eng'g Corp., 139 AD2d 292, 297, lv dismissed and denied 73 NY2d 783), as would a franchisor (contra, Smith v City of New York, supra, at 818; Balsam v Delma Eng'g Corp., supra), or a manufacturers trade association or labor union that allowed its symbol to be placed on a product. The law of products liability does not contemplate that result.

■ Having found that plaintiffs' basic premise is flawed, we reject their argument that LSB is amenable to long-arm jurisdiction. CPLR 302 (a) (3) provides that a court may exercise long-arm jurisdiction over any nondomiciliary that commits a tortious

act without the State causing injury within the State, provided that the defendant (1) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the State, or (2) expects or should reasonably expect the act to have consequences in the State and derives substantial revenue from interstate or international commerce. The record establishes that LSB played no part in the manufacture, distribution or sale of the lathe *(see, Sukljian v Ross & Son Co., supra; Zwirn v Bic Corp., supra; Delzotti v American LaFrance, supra)*. It thus cannot be deemed to have committed a tortious act without the State. In any event, commission of a tortious act without the State, without the requisite New York contacts, would not justify the exercise of long-arm jurisdiction over LSB. To establish the requisite contacts under the long-arm statute and the Due Process Clause, plaintiff must show that defendant regularly transacted or solicited business, engaged in any other persistent course of conduct, or otherwise " 'purposefully directed' " its activities at residents of the forum *(Burger King Corp. v Rudzewicz,* 471 US 462, 472; *see, World-Wide Volkswagen Corp. v Woodson,* 444 US 286; *Kreutter v McFadden Oil Corp.,* 71 NY2d 460, 467; CPLR 302 [a] [3] [i], [ii]). Defendant established that, as a mere holding company, it has no contacts with New York, and plaintiff did not rebut that showing. Assuming, arguendo, that LSB was a tortfeasor, it is well established that: "The placement of a product into the stream of commerce, without more, is not an act of the defendant purposely directed toward the forum State * * * [A] defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State." *(Asahi Metal Indus. Co. v Superior Ct.,* 480 US 102, 112.) Consequently, there is no basis for the exercise of long-arm jurisdiction over LSB based on its conduct or contacts with New York.

**LSB IS NOT SUBJECT TO LONG-ARM JURISDICTION BASED ON THE CONDUCT AND FORUM CONTACTS OF SUMMIT**

Under CPLR 302, a court may exercise long-arm jurisdiction over any nondomiciliary which "in person or through an agent" has engaged in the enumerated conduct and has the requisite minimal contacts with New York *(see generally,*

*Kreutter v McFadden Oil Corp., supra).* Plaintiff seeks to bring LSB before the courts of this State on the basis of the alleged tortious conduct and forum contacts of its wholly owned subsidiary, Summit. For plaintiffs to succeed in that attempt, they must show two things: that Summit is amenable to long-arm jurisdiction, and that LSB and Summit are in a principal-agent relationship.

■ Assuming, arguendo, that Summit has the requisite contacts with New York, we nevertheless conclude that plaintiffs failed to show that Summit is LSB's agent for jurisdictional purposes. A finding of agency for jurisdictional purposes will not be inferred from the mere existence of a parent-subsidiary relationship *(Frummer v Hilton Hotels Intl.,* 19 NY2d 533, 538, *rearg denied* 20 NY2d 758, *cert denied* 389 US 923 [held: common ownership significant only if there are indications of control]). In order for the subsidiary's activities to warrant the exercise of jurisdiction over the parent, the parent's control over the subsidiary's activities "must be so complete that the subsidiary is, in fact, merely a department of the parent" *(Delagi v Volkswagenwerk AG.,* 29 NY2d 426, 432, *rearg denied* 30 NY2d 694; *see also, Public Adm'r of County of N. Y. v Royal Bank,* 19 NY2d 127, 130-132 ["alter ego" of parent]; *Taca Intl. Airlines v Rolls-Royce of England,* 15 NY2d 97, 99-102 ["mere department", "division", "instrumentality", or "arm" of parent]). A subsidiary will be considered a "mere department" only if the foreign parent's control of the subsidiary is so pervasive that the corporate separation is more formal than real *(Heller & Co. v Novacor Chems.,* 726 F Supp 49, 54, *affd* 875 F2d 856 [SD NY—applying New York law]). Generally, there are four factors used in determining whether a subsidiary is a mere department of the foreign parent: (1) common ownership and the presence of an interlocking directorate and executive staff; (2) financial dependency of the subsidiary on the parent; (3) the degree to which the parent interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities; and (4) the degree of the parent's control of the subsidiary's marketing and operational policies *(Volkswagenwerk AG. v Beech Aircraft Corp.,* 751 F2d 117, 120-122 [2d Cir —applying New York law]).

Considering those factors, we conclude that LSB's control over Summit is not so pervasive as to render Summit a mere department of LSB. There is complete stock control and the directors and officers of the two entities overlap to an extent,

but those factors are intrinsic to the parent-subsidiary relationship and, by themselves, not determinative *(Volkswagenwerk AG. v Beech Aircraft Corp., supra,* at 120). It does not appear that the subsidiary is financially dependent on the parent. On the contrary, it appears that the parent, as a holding company in the business of acquiring other entities for investment purposes, is financially dependent on its subsidiaries. Moreover, although LSB provides Summit with certain legal, accounting, banking and insurance services, it charges market rates for those services. There is no evidence that LSB fails to observe corporate formalities in its relationship with its subsidiaries, and indeed the record shows that it does not interfere in the recruitment and assignment of Summit's employees *(cf., Public Adm'r of County of N. Y. v Royal Bank, supra,* at 130-132). Finally, defendant established that it does not control the subsidiary's policies and day-to-day operations *(cf., Taca Intl. Airlines v Rolls-Royce of England, supra,* at 101).

Defendant cites several Federal diversity cases in which the courts, applying New York law, found jurisdiction over the parent corporation lacking, notwithstanding the foreign parent's involvement in the affairs of its subsidiary to an extent far greater than is the case here *(see, Morse Typewriter Co. v Samanda Off. Communications,* 629 F Supp 1150, 1152-1156; *Ross v Colorado Outward Bound School,* 603 F Supp 306, 309-310; *Saraceno v Johnson & Son,* 83 FRD 65). Those cases compel the dismissal of the action against LSB for lack of personal jurisdiction. Similarly, dismissal on jurisdictional grounds is compelled by the New York cases. Among those cases that hold a foreign parent amenable to suit in New York based on the activities of a subsidiary deemed to be a "mere department" of the parent, the common thread is that, in each case, the subsidiary was performing the same activities (i.e., "doing all the business") that the parent would have performed had it been doing or transacting business in New York *(see, e.g., Frummer v Hilton Hotels Intl., supra* [subsidiary acted as reservations service for defendant parent hotelier]; *Taca Intl. Airlines v Rolls-Royce of England, supra* [subsidiary's sole business was the sale of products manufactured by parent]; *Public Adm'r of County of N. Y. v Royal Bank, supra* [subsidiary and parent both in banking business]). That is not the case here. LSB is a holding company whose business is investment, which differs from the business of Summit, which is distribution of machine tools. The business

of the parent is carried out entirely at the parent level, and Summit cannot be deemed to be conducting the parent's business as its agent *(see, Bellomo v Pennsylvania Life Co.,* 488 F Supp 744, 746 [SD NY—applying New York law])*.

### LSB CANNOT BE HELD LIABLE FOR ITS OWN CONDUCT

■ LSB demonstrated that it is entitled to summary judgment on the issue of direct liability, and plaintiffs did not sustain their burden to demonstrate a triable question of fact. As indicated, the record establishes that LSB was not involved in the design, manufacture, distribution, marketing, sale, warranting, maintenance, or repair of the lathe, cannot be held liable in either negligence or strict products liability *(Sukljian v Ross & Son Co., supra; Delzotti v American La-France, supra; Kane v Cohen Distribs. of Gen. Mdse., supra)* and cannot be held liable merely because it is the registered owner of the trademark.

### LSB CANNOT BE HELD VICARIOUSLY LIABLE
### FOR THE CONDUCT OF SUMMIT

LSB demonstrated its entitlement to summary judgment on the issue of vicarious liability, and plaintiffs failed to present a triable question of fact on that issue. Plaintiffs could have established LSB's liability for the conduct of Summit only by demonstrating that LSB and Summit were in a principal-agent relationship, or by persuading the court to "pierce the corporate veil" of Summit and impose shareholder liability on LSB *(see generally, Walkovszky v Carlton,* 18 NY2d 414, 418, 421).

■ There is no basis for imposing liability on LSB as a principal. As we have concluded, there is no evidence of domination and control over Summit's day-to-day operations so as to warrant the imposition of vicarious liability on LSB.

Similarly, there is no basis for imposing liability upon LSB in its capacity as shareholder by "piercing the corporate veil". This is not a case where the subsidiary is undercapitalized; where the shareholder failed to observe corporate formalities; or where the subsidiary was misused either to perpetrate a fraud or to inflict injury *(see generally, Walkovszky v Carlton, supra; Jeras v East Mfg. Corp.,* 168 AD2d 889, *lv granted* 77 NY2d 807, *appeal withdrawn* 78 NY2d 953)*. Nor is this a case where the subsidiary was formed and incorporated for the

purpose of carrying out the parent's business while insulating the parent from liability *(see, Billy v Consolidated Mach. Tool Corp.,* 51 NY2d 152, 163, *rearg denied* 52 NY2d 829; *Walkovszky v Carlton, supra,* at 417, 419-420). The parent purchased the subsidiary as an ongoing entity for investment purposes, and the subsidiary retains its independent corporate status. There is no reason to depart from the general rule of shareholder immunity.

Accordingly, the order should be reversed, LSB's motion for summary judgment granted and the complaint dismissed.

BALIO, LAWTON, FALLON and DAVIS, JJ., concur.

Order unanimously reversed, on the law, without costs, motion granted and complaint dismissed.